UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

DANIEL MEDINA REYES,

                              Plaintiff,                              **DECISION AND ORDER**

          - *against* -                                               21 Civ. 372 (AEK)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
---------------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

Plaintiff Daniel Medina Reyes brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of Defendant Commissioner of Social Security (the

"Commissioner"), which denied his application for benefits under the Social Security Act (the

"Act"). ECF No. 1. Plaintiff has moved for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure, ECF Nos. 23-24, and the Commissioner has cross-moved

for judgment on the pleadings, ECF No. 25-26. For the reasons that follow, Plaintiff's motion

(ECF Nos. 23-24) is GRANTED, the Commissioner's motion (ECF Nos. 25-26) is DENIED,

and the case is remanded for further administrative proceedings pursuant to sentence four of 42

U.S.C. § 405(g).

## BACKGROUND

### I.      Procedural History

On December 22, 2016, Plaintiff filed an application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI"). AR 84, 85. Plaintiff claimed that he had

---

[1] This parties consented to the jurisdiction of the undersigned for all purposes on June 9,
2021. ECF No. 15.

been disabled as of May 26, 2016, and sought benefits for a closed period beginning on that date and ending on January 1, 2018.[2]  AR 396.  In his initial filing, Plaintiff claimed he was disabled due to bipolar depression, a right calcaneal fracture, and pain in his right foot and right ankle. AR 86.  After the Social Security Administration (the "SSA") initially denied his claim on March 6, 2017, AR 112-16, Plaintiff requested a hearing before an administrative law judge ("ALJ"), AR 122-48.  An administrative hearing was held on May 23, 2019 and continued on September 26, 2019, during which Plaintiff was represented by counsel.  AR 40-83.

ALJ Elias Feuer issued a decision on December 20, 2019, finding that Plaintiff was not disabled within the meaning of the Act from the alleged onset date, May 26, 2016, through the date of the decision.[3]  AR 9-34.  Plaintiff subsequently filed a request for review of that decision with the SSA's Appeals Council, which was denied on November 18, 2020.  AR 1-8.  That made the ALJ's decision the final decision of the Commissioner.  The instant lawsuit, seeking judicial review of the ALJ's decision, was filed on January 15, 2021.  ECF No. 1.

## II.     Medical and Testimonial Evidence

Plaintiff has provided a summary of the medical and testimonial evidence contained in the administrative record.  *See* ECF No. 24 ("Pl.'s Mem.") at 1-15.  The Commissioner states in her memorandum of law that she does not challenge Plaintiff's recitation of the facts, "with the exception of any inferences, arguments or conclusions asserted therein," and then proceeds to recite what she considers to be the "relevant facts."  Def.'s Mem. at 4-9.  Based on an

---

[2] Plaintiff sought benefits for this closed period because he returned to work as of January 1, 2018.  AR 18, 58-59, 318-19.

[3] Even though the ALJ's decision indicates that the finding of "not disabled" was through "the date of the decision" (December 20, 2019), the Commissioner concedes that the only time period adjudicated by the SSA—and therefore the only time period at issue here—is the closed period from May 26, 2016 through January 1, 2018.  *See* ECF No. 26 ("Def.'s Mem.") at 9 n.7.

independent and thorough examination of the record, the Court finds that the parties' summaries of the evidence are largely comprehensive and accurate. Accordingly, the Court adopts the factual background as set forth by the parties and discusses the evidence in the record in more detail to the extent necessary to determine the issues raised in this case. *See, e.g.*, *Banks v. Comm'r of Soc. Sec.*, No. 19-cv-929 (AJN) (SDA), 2020 WL 2768800, at *2 (S.D.N.Y. Jan. 16, 2020), *adopted by* 2020 WL 2765686 (S.D.N.Y. May 27, 2020).

## APPLICABLE LEGAL PRINCIPLES

### I.     Standard of Review

The scope of review in an appeal from a Social Security disability determination involves two levels of inquiry. First, the court must review the Commissioner's decision to assess whether the Commissioner applied the correct legal standards when determining that the plaintiff was not disabled. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Failure to apply the correct legal standards is grounds for reversal.'" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

Second, the court must decide whether the Commissioner's decision was supported by substantial evidence. *Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 106 (quotation marks omitted). The "substantial evidence" standard of review is "very deferential," and it is not the function of the reviewing court "to determine *de novo* whether a plaintiff is disabled." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) (quotation marks omitted). To determine whether a decision by the Commissioner is supported by substantial evidence, courts must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."

3

*Id.* (quotation marks omitted).  "The substantial evidence standard means once an ALJ finds

facts, [courts] can reject those facts only if a reasonable factfinder would *have to conclude*

*otherwise*."  *Id.* (quotation marks omitted) (emphasis in original).

## II.    Determining Disability

The Act defines "disability" as "the inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) .  An individual is disabled

under the Act if he or she suffers from an impairment which is "of such severity that he [or she]

is not only unable to do his [or her] previous work but cannot . . . engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).  "'[W]ork which exists in the national economy' means work which exists in

significant numbers either in the region where such individual lives or in several regions of the

country."  *Id.*

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner

must follow in determining whether a particular claimant is disabled.  *See* 20 C.F.R. §

404.1520(a)(4).  The Commissioner first considers whether the claimant is engaged in

"substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b).  If the

claimant is engaged in substantial gainful activity, then the Commissioner will find that the

claimant is not disabled; if the claimant is not engaged in substantial gainful activity, then the

Commissioner proceeds to the second step, at which the Commissioner considers the medical

severity of the claimant's impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A

severe impairment is "any impairment or combination of impairments which significantly limits

4

[the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant suffers from any severe impairment, the Commissioner at step three must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render an individual disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of SSA regulations. 20 C.F.R §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

If the claimant's impairments do not satisfy the criteria of a listed impairment at step three, the Commissioner must then determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). After determining the claimant's RFC, the Commissioner proceeds to the fourth step to determine whether the claimant can perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f), 416.920(a)(4)(iv), (e)-(f). If it is found that the claimant cannot perform his or her past relevant work, the Commissioner proceeds to step five to consider the claimant's RFC, age, education, and work experience to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g). To support a finding that the claimant is disabled, there must be no other work existing in significant numbers in the national economy that the claimant, in light of his or her RFC and vocational factors, is capable of performing. 20 C.F.R. § 404.1560(c).

The claimant bears the burden of proof on the first four steps of this analysis. *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998). If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps. *Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 1999). If the fifth step is necessary, the burden shifts

to the Commissioner to show that the claimant is capable of performing other work.  *DeChirico*,

134 F.3d at 1180.

## DISCUSSION

Plaintiff seeks to reverse the Commissioner's decision and requests that the Court award

benefits or, in the alternative, remand the matter to the SSA for further administrative

proceedings.  Pl.'s Mem. at 1.  Plaintiff contends that the ALJ: (1) failed to consider his bipolar

disorder at step three of the sequential analysis; (2) improperly determined his RFC based on the

evidence in the record; and (3) made an erroneous determination at step five of the sequential

analysis by failing to call a vocational expert and incorrectly applying the Medical Vocational

Rules.  *Id.* at 16-31.  The Commissioner maintains that the ALJ's decision is supported by

substantial evidence and is based upon an application of the correct legal standards.  Def.'s Mem.

at 11-34.

As discussed below, the Court finds that the ALJ's step three analysis was appropriate

and that the ALJ's RFC determination was supported by substantial evidence, but the Court

further finds that the ALJ committed legal error at step five.  Accordingly, this case must be

remanded to the SSA for further administrative proceedings pursuant to sentence four of 42

U.S.C. § 405(g).

### I.    The ALJ's Decision

ALJ Feuer applied the five-step sequential analysis described above and issued a decision

finding that Plaintiff was not disabled during the closed period from May 26, 2016 to January 1,

2018.  AR 15-27.  First, the ALJ found that Plaintiff had not engaged in substantial gainful

activity during the closed period.  AR 17-18.  Second, the ALJ determined that Plaintiff had four

severe impairments: (1) a right calcaneal fracture, (2) depression, (3) alcohol use disorder, and

(4) cocaine use disorder.  AR 18.  Third, the ALJ determined that Plaintiff did not have any

impairment or combination of impairments that met or medically equaled the severity of one of

the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 18-19.

According to the ALJ, Plaintiff retained the RFC to perform sedentary work as defined in

20 C.F.R. §§ 404.1567(a) and 416.967(a),[4] with certain additional exertional and non-exertional

limitations.  AR 19-20.  With respect to non-exertional limitations, the ALJ concluded that

Plaintiff was limited to performing simple, routine and repetitive tasks; making simple work-

related decisions; and occasional interaction with co-workers, supervisors and the general public.

*Id.*  In terms of further exertional limitations, the ALJ concluded Plaintiff required a cane to walk

but not to stand.  *Id.*

The ALJ determined Plaintiff's RFC by applying the two-step framework described in 20

C.F.R. §§ 404.1529 and 416.929 and SSR 16-3p.[5]  AR 20.  He concluded that although

Plaintiff's "medically determinable impairments could reasonably be expected to cause the

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

[5] The ALJ specified that the first step in the process is to determine "whether there is an underlying medically determinable physical or mental impairment(s)—*i.e.*, an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce claimant's pain or other symptoms."  AR 20.  The second step in the process, "once an underlying physical or mental impairment(s) that could be reasonably be expected to produce the claimant's pain or other symptoms has been shown," is for the ALJ to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  *Id.*  "[W]henever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities."  *Id.*

alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR 20.  In support of this finding, the ALJ cited, among other things, medical evidence that during the relevant period, Plaintiff's mental status examinations were "unremarkable," his mood was noted as "euthymic," and he denied any depression or anxiety during his examinations.  AR 23-24.  He also noted that "once treatment was underway for both [Plaintiff's] substance use disorder and his bipolar disorder, his mental status and functioning considerably improved."  AR 23; *see id.* ("Despite the multiple diagnoses, [Plaintiff] improved significantly once he began taking psychotropic medications and stated as much.").  With respect to Plaintiff's physical limitations regarding his calcaneal fracture, the ALJ noted that Plaintiff "has attended multiple courses of physical therapy during the required closed period, which he stated helped his functioning and decreased his pain."  AR 20.   The ALJ also cited numerous records showing that there had been improvements in Plaintiff's physical condition over the course of the closed period, and various records indicating in Plaintiff could perform "most of his activities of daily living, including laundry, cooking and cleaning."  AR 21, 22.

ALJ Feuer also considered the medical opinion evidence in the record.  Regarding Plaintiff's claimed mental limitations, the ALJ assigned "good weight" to the opinion of Dr. Efobi, a testifying medical expert.  AR 18.  Dr. Efobi testified at the hearing that Plaintiff suffered from bipolar disorder, as well as alcohol and crack cocaine use disorder.  AR 45. According to Dr. Efobi, however, the severity of Plaintiff's mental impairments, considered individually and together, did not meet or equal the criteria of Listing 12.04.  AR 46; AR 25. The ALJ found Dr. Efobi's opinion to be "well supported by the claimant's treatment records." AR 18.

The ALJ likewise assigned "good weight" to the opinions of Dr. Sebold, a consultative psychiatric examiner, and Dr. Blackwell, a non-examining state psychologist.  Dr. Sebold diagnosed Plaintiff with bipolar disorder and substance use disorder, and opined that Plaintiff was moderately limited in doing complex tasks, making work related decisions, regulating his emotions, controlling his behavior, maintaining his wellbeing, and in concentrating, persisting, and pacing himself.  AR 628-29; AR 25.  Dr. Sebold further opined that Plaintiff was only mildly limited for interactions, and not limited at all for doing simple tasks, sustaining an ordinary work routine, or ordinary attendance at work.  AR 628; AR 25.  Dr. Blackwell also opined that Plaintiff was moderately limited in interacting with others, adapting or managing himself, and in concentrating, persisting, and pacing himself, and mildly limited in understanding, remembering, and applying information.  AR 95; AR 25.  The ALJ determined that these opinions were generally well supported by Plaintiff's treatment records.  AR 25.  He further noted that Dr. Sebold's opinion was "consistent both with the examination findings and with the many treatment notes," and that Dr. Blackwell's opinion was "consistent with the treatment notes and with the opinion of the consultative examiner."  *Id.*

In addition to the foregoing opinions, Dr. Sebold also opined that Plaintiff's psychiatric and substance abuse problems may significantly interfere with his ability to function on a daily basis.  AR 628-29; AR 25.  ALJ Feuer did not give "much weight" to this opinion, however, "because there is no indication in the record" that Plaintiff's diagnoses did in fact interfere with his ability to function "to any significant degree."  AR 25.

Meanwhile, the ALJ gave little weight to the opinion of Dr. Terrelonge,[6] Plaintiff's treating psychologist, "in all respects."  AR 24.  Dr. Terrelonge opined that Plaintiff had moderate limitations for understanding, remembering, and carrying out simple and complex instructions and for making work related decisions.  AR 920; AR 24.  He further opined that Plaintiff was markedly limited in interacting with the public and supervisors, moderately limited in interacting with co-workers, and markedly limited in responding appropriately to the usual work situations and to changes in a routine work setting.  AR 921; AR 24.  In May 2017, Dr. Terrelonge reported Plaintiff had a GAF of 50 due to bipolar disorder and noted numerous clinical signs including mood disturbance, emotional lability, difficulty concentrating, poor memory and a sleep disturbance.  AR 1904; AR 24.  In his decision, ALJ Feuer noted that "[w]ith the exception of insomnia, for which [Plaintiff] had been prescribed Ambien, none of these clinical signs materialized during the mental status examinations."  AR 24.  The ALJ summarized the treatment notes as stating that "the claimant was doing well with rare exception," and concluded that Dr. Terrelonge's opinions were "nearly impossible to reconcile . . . with the treatment notes at Exhibit 13F or with Dr. Terrelonge's own treatment records at Exhibit 21F."  *Id.*

As for Plaintiff's claimed physical limitations, the ALJ assigned only "some weight" to the opinion of Dr. Archbald, an internist who performed a consultative physical examination and opined that Plaintiff was mildly limited for walking and squatting.  AR 21; AR 633.  The ALJ accorded only "some weight" to Dr. Archbald's opinion because he concluded that, "given the

---

[6] The ALJ misspells Dr. Terrelonge's name throughout his decision.  This Decision and Order adopts the spelling that appears in the medical records.  *See, e.g.*, AR 1198, 1205, 1223.

treatment notes, greater limitations are warranted."  AR 21.  The ALJ also assigned little weight

to the opinions of Plaintiff's treating podiatrist, Dr. Song, and treating internist, Dr. Liriano.

       Dr. Song completed a Treating Physician's Wellness Plan Report but did not submit any

other records.  *See* AR 471-72; AR 22.  The only opinion from Dr. Song that was addressed by

the ALJ is Dr. Song's assertion that Plaintiff was unemployable due to a right calcaneal fracture.

AR 22; AR 472.  The ALJ gave little weight to this opinion because "[t]hat issue is reserved to

the Commissioner."  AR 22.

       Dr. Liriano completed Medical Source Statements in connection with Plaintiff's

disability claims in April 2017 and February 2019.  In the April 2017 opinion, Dr. Liriano stated,

among other things, that Plaintiff could only occasionally reach, push and pull with the right

upper extremity, could not use right foot controls, and could not climb ladders, scaffolds,

balance, stoop or crouch, could only occasionally crawl, kneel and use stairs and ramps, and

needed to avoid respiratory irritants.  AR 639-44; AR 22.  The ALJ assigned "very little weight"

to Dr. Liriano's opinion specifically with respect to "the sitting, postural and right upper

extremity limitations and respiratory restrictions," noting that such findings were inconsistent

with the treatment notes in the record.  AR 22.  As explained by the ALJ, the treatment notes

contain evidence that Plaintiff reported that he could do most of his activities of daily living

including laundry, cooking, and cleaning; that he used both the bus and the subway

independently; that he had no problems sitting; and that on at least one occasion during the

closed period, Plaintiff reported he had no pain and normal sensation and muscle power.  *Id.*; AR

331-36, 601, 1896-97.  The ALJ also noted Plaintiff had not been diagnosed with asthma or any

other respiratory condition "that would warrant environmental limitations."  AR 22.

At the fourth step, the ALJ determined that Plaintiff was unable to perform any past relevant work during the period alleged because his previous jobs—cleaning cars, working in a factory, working as a parking valet, and working as a guard—"involved standing and walking all day."  AR 26; AR 339-46.

At the fifth step, the ALJ found that based on Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could have performed during the closed period of disability at issue.  AR 26-27.  The ALJ did not consult a vocational expert or otherwise elicit evidence regarding the work that Plaintiff was capable of performing.  Instead, he consulted section 201.21 of the Medical-Vocational Guidelines to make his determination.  *Id.*  The ALJ concluded that even though the RFC included certain limitations, neither Plaintiff's mental nor his physical impairments required a finding of disability.  Specifically, the ALJ found that Plaintiff "retained the ability to satisfy the mental demands of work" and Plaintiff's "use of a cane when walking does not erode the occupational base."  AR 27.  The ALJ therefore concluded that Plaintiff was not disabled during the closed period of May 26, 2016 through January 1, 2018.[7]  AR 27.

## II.    The ALJ's Step Three Determination

Plaintiff maintains that the ALJ erred at step three of the analysis by failing to consider Plaintiff's diagnosed bipolar disorder in assessing whether Plaintiff had any condition that met or equaled a Listing impairment.  Pl.'s Mem. at 16-19.

---

[7] The ALJ noted that pursuant to Vocational Rule 201.12, Plaintiff would be "disabled" as of October 5, 2017—Plaintiff's 50th birthday.  But because Plaintiff resumed working on January 1, 2018, "he would not be entitled to benefits because his disability did not satisfy the 12 month durational requirement."  AR 27 (citing SSR 82-52, 1982 WL 31376 (Jan. 1, 1982)).  Plaintiff does not contest this portion of the ALJ's decision in his submissions.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id*. An impairment may also be "medically equivalent" to a listed impairment if it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). To satisfy the criteria of Listing 12.04 (Depressive, bipolar and related disorders), Plaintiff must meet the requirements of paragraph A *and* either paragraph B or paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(A)(2).

### A.  Paragraph A Criteria

The paragraph A criteria are "the medical criteria that must be present in [a claimant's] medical evidence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2)(a). To satisfy the paragraph A criteria of Listing 12.04, a Plaintiff must provide medical documentation of (1) depressive disorder, characterized by five or more specified symptoms, or (2) bipolar disorder, characterized by three or more of a different specified set of symptoms. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. Paragraph A is the only section of Listing 12.04 that specifically references bipolar disorder—the paragraph B and paragraph C criteria for Listing 12.04 are the same regardless of whether the claimant meets the paragraph A(1) or A(2) threshold (or both). *See id.* Here, ALJ Feuer did not explicitly address the paragraph A criteria; in such circumstances, courts assume that the ALJ found that the paragraph A criteria have been satisfied. *See, e.g., Gonzalez v. Saul*, No. 19-cv-2317 (JLC), 2020 WL 5550043, at *19 (S.D.N.Y. Sept. 16, 2020). Accordingly, any failure by the ALJ to specifically reference bipolar disorder in connection with the step three analysis was harmless. The ALJ is presumed to have found that Plaintiff met the paragraph A criteria—which include bipolar disorder—and his

evaluation of the paragraph B and C criteria is based on a review of the medical evidence from the same sources who diagnosed Plaintiff with bipolar disorder and incorporated that diagnosis into their clinical findings and opinions.  Moreover, the fact that ALJ Feuer made multiple references to Plaintiff's bipolar disorder diagnosis in his decision substantially undercuts the notion that he neglected to consider the impact of that diagnosis at any step in the sequential analysis.  *See* AR 23-25; *see also Danza v. Comm'r of Soc. Sec.*, No. 18-cv-6841 (BMC), 2019 WL 6033097, at \*4-5 (E.D.N.Y. Nov. 14, 2019) (rejecting argument that the ALJ "failed to consider [plaintiff's] diagnosis of fibromyalgia" where the ALJ's decision discussed that plaintiff experienced symptoms of, and was later diagnosed with, fibromyalgia).

**B.    Paragraph B and C Criteria**

To meet the criteria of paragraph B of Listing 12.04, a plaintiff must demonstrate either "extreme" limitation of one or "marked" limitation of two of the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.  Limitations in an area of functioning are considered "marked" when the ability to function independently, appropriately, and effectively on a sustained basis is seriously limited, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(d), and are considered "extreme" when there is no ability to function independently, appropriately, and effectively on a sustained basis, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(e).

Here, the ALJ found that Plaintiff's impairments did not satisfy the paragraph B criteria of Listing 12.04 because his mental impairments did not cause marked or extreme limitations in any of the four categories.  AR 18-19.  Rather, the ALJ assessed that Plaintiff had mild to moderate limitations in understanding, remembering, or applying information; mild to moderate

14

limitations in interacting with others; moderate limitations in concentrating, persisting or maintaining pace; and moderate limitations in adapting or managing. *Id.* These conclusions were supported by substantial evidence. In particular, the ALJ relied on the testimony of a medical expert, Dr. Efobi, who explained, based on his review of the record evidence, that none of Plaintiff's mental impairments met or equaled a Listing. AR 18. The ALJ also considered the opinions of the consultative examiner, Dr. Sebold—who, as the ALJ acknowledged, diagnosed Plaintiff with bipolar disorder, *see* AR 25— and the state agency examiner, Dr. Blackwell, in reaching these conclusions. *Id.*

Plaintiff asserts that the ALJ "erred in finding Mr. Reyes did not meet or equal the B criteria of Listing 12.04," citing exclusively to Dr. Terrelonge's opinion that Plaintiff had marked to extreme limitations in three of the paragraph B categories. Pl.'s Mem. at 18-19. But as discussed in further detail below, even though the ALJ considered the opinions of Dr. Terrelonge—who also diagnosed Plaintiff with bipolar disorder, *see* AR 24—the ALJ did not err in ascribing little weight to these opinions, because they are inconsistent with the doctor's own treatment notes. *See* Section III.B.2.a, *infra*.

Plaintiff does not specifically contest the ALJ's assessment that Plaintiff failed to meet the paragraph C criteria of Listing 12.04, *see* AR 19, but there also was substantial evidence to support this determination. To meet the paragraph C criteria of Listing 12.04, a claimant must demonstrate that his or her condition was "serious or persistent" by showing a medically documented history of the existence of the disorder over a period of at least two years, and evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (2) marginal adjustment, or minimal capacity to adapt to changes in his or her

environment or to demands that are not already part of his or her daily life.  20 C.F.R. Pt. 404,

Subpt. P, App'x 1, § 12.04(C).  Here, ALJ Feuer concluded that Plaintiff did not establish any

"serious and persistent" mental disorder.  AR 19.  He noted that "the treatment notes indicated

that [Plaintiff] improved significantly and that he had considerably more than a minimal capacity

to adapt to changes in the environment."  *Id.*  The ALJ further explained that this conclusion was

supported by Dr. Sebold's report and opinion, which "indicated that claimant was not limited in

sustaining an ordinary work routine and regular attendance at work."  *Id.*    For all of these

reasons, Plaintiff's argument that the ALJ's step three determination was flawed because he

failed to consider Plaintiff's diagnosis of bipolar disorder is without merit, and the ALJ's

conclusions at step three were supported by substantial evidence.

### III.    The ALJ's RFC Determination

Plaintiff makes numerous challenges to the ALJ's RFC determination.  Specifically, he

contends that the RFC is deficient because: (1) the ALJ failed to consider certain diagnoses; (2)

the ALJ improperly applied the treating physician rule; (3) the ALJ did not consider side effects

of Plaintiff's medications; (4) the RFC was inconsistent with the ALJ's findings regarding the

paragraph B criteria of Listing 12.04; (5) the RFC does not account for Plaintiff's physical

limitations; and (6) the RFC does not account for Plaintiff's limited English proficiency.  Pl.'s

Mem. at 19-28.  For the following reasons, the Court rejects each of Plaintiff's arguments and

finds that the RFC determination is based on substantial evidence.

### A.    Bipolar Disorder and White Matter Disease

Plaintiff asserts in conclusory fashion that the RFC analysis was flawed because the ALJ

"should have considered the impact of Mr. Reyes's bipolar disorder in his RFC determination."

Pl.'s Mem. at 19.  It is clear from ALJ Feuer's decision, however, that he did take into account

the fact that Plaintiff was diagnosed with bipolar disorder by multiple medical providers.  The ALJ gave "good weight" to the opinion of Dr. Efobi, the testifying medical expert, who acknowledged Plaintiff's bipolar disorder diagnosis, but nevertheless offered the opinion that "despite the diagnosis of bipolar, [Plaintiff] had . . . nonacute mental health concerns."  AR 46. The ALJ also gave "good weight" to the opinion of Dr. Sebold, the consultative psychiatric examiner, who diagnosed Plaintiff with bipolar disorder, but offered an assessment of Plaintiff's ability to function according to various metrics that supported the ultimate RFC finding.  AR 25. In other words, the ALJ did not ignore evidence in the record regarding Plaintiff's bipolar disorder diagnosis; rather, he concluded based on a comprehensive review of the medical evidence in the record that Plaintiff's bipolar disorder did not render him unable to work. Consistent with this conclusion, the ALJ also noted in the RFC explanation that "once treatment was underway for both Plaintiff's substance use disorder and his bipolar disorder, his mental status and functioning considerably improved."  AR 23.  To the extent the evidence considered by the ALJ conflicts with other evidence that suggests that Plaintiff may have been more limited by his mental health disorders, the Court must "defer to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  There is no merit to Plaintiff's argument that the ALJ failed to consider the impact of Plaintiff's bipolar disorder in his RFC finding.

Plaintiff next contends that he suffered from "white matter disease" during the relevant period, and that the ALJ erred in failing to address this "progressive brain disease" in formulating the RFC.  AR 24-25.  Plaintiff cites a single record in support of this diagnosis: a March 21, 2017 MRI, which indicates a finding of "[m]oderate nonspecific subcortical white matter disease."  AR 1055.  Citing to webmd.com, Plaintiff asserts that white matter disease

17

causes "trouble learning or remembering new things; difficulty problem solving; slowed

thinking; depression; problems walking; balance issues and falls." Pl.'s Mem. at 8-9 n.8, 19. In

support of his argument that the ALJ erred in failing to consider this brain disease, Plaintiff

points to various places in the record where it is noted that he had "deficits in understanding,

remembering, and carrying out simple instructions; maintaining attention and concentration;

remembering locations and work-like procedures; asking simple questions and requesting

assistance; making simple work-related decisions or making realistic goals or plans." *Id.* at 19.

Plaintiff also notes that he had depressive symptoms and trouble walking, both of which also

allegedly are consistent with a diagnosis of white matter disease. *See id.* at 20.

Even though the ALJ's decision does not make reference to "white matter disease," it is

clear from the decision that ALJ Feuer considered and addressed all of the symptoms Plaintiff

attributes to white matter disease in reaching his RFC decision. For example, the ALJ gave good

weight to the opinion of Dr. Sebold, who stated that Plaintiff was "moderately limited for doing

complex tasks, making work related decisions, concentrating, persisting and pacing himself and

for regulating his emotions, controlling behavior and maintaining his well[-]being." AR 25.

And while Plaintiff implies that white matter disease may have been a cause of his depression

and trouble walking, Pl.'s Mem. at 19-20, he fails to explain how attributing these symptoms to

"white matter disease" would have changed the ALJ's analysis for purposes of determining RFC.

Moreover, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to

discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate

that it was not considered." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y.

2005) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Plaintiff's argument that the ALJ failed to develop the record regarding this apparent brain disease, Pl.'s Mem. at 20-21, is also unavailing. In a proceeding to determine whether a claimant is disabled, the ALJ has an affirmative duty to develop the administrative record. *See Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history"). "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when, as here, the claimant is represented by counsel." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted). The obligation to develop the record exists only when there are "gaps" in the record. *Rosa*, 168 F.3d at 82-83.

Here, Plaintiff has identified a diagnosis on a single page of a nearly 2,000-page record, but has not identified any gaps in the record. While Plaintiff asserts that the ALJ should have obtained either a neurological consultative exam or "further information about Mr. Reyes['s] brain disease from Mr. Reyes's treating physicians," Pl.'s Mem. at 21, he does not suggest that white matter disease functionally limits him in any unique respect, *i.e.*, in any way that he is not already limited by his ankle injury and depression. Thus, in effect, the record reflects that the ALJ already had an opportunity to evaluate the impairments that could potentially have been attributed to white matter disease, and already incorporated those impairments into the RFC. And in any event, "[w]hile the ALJ has a duty to develop the record, the mere diagnosis of any impairment is insufficient to require the ALJ to order a consultative examination – especially impairments that plaintiff does not assert are disabling." *Ostuni v. Saul*, No. 19-cv-21 (RAR), 2019 WL 6271353, at *13 (D. Conn. Nov. 25, 2019). Accordingly, the ALJ did not err in failing to consider, or in failing to develop the record related to Plaintiff's white matter disease.

**B.     The ALJ Properly Applied the Treating Physician Rule**

**1.  Legal Standard for Application of the Treating Physician Rule**

As a general matter, an ALJ is directed to consider "every medical opinion" in the record,

regardless of its source.  20 C.F.R. § 404.1527(c).[8]  Yet not every medical opinion is assigned

the same weight.  Under SSA regulations, the opinions of a treating source as to the nature and

severity of a claimant's impairments are generally, but not always, entitled to "more weight"

relative to those from other treatment providers.  *See* 20 C.F.R. § 404.1527(c)(2); *Diaz v.

Shalala*, 59 F.3d 307, 313 (2d Cir. 1995).  A medical opinion from a claimant's treating source

"must be given controlling weight if it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

case record."  *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d Cir. 2022) (quotation marks omitted).

Conversely, opinions from treating sources "need not be given controlling weight where they are

contradicted by other substantial evidence in the record."  *Veino v. Barnhart*, 312 F.3d 578, 588

(2d Cir. 2002); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*) (a

treating source opinion is not afforded controlling weight if it is "not consistent with other

substantial evidence in the record, such as the opinions of other medical experts").

If the ALJ determines that a treating source's opinion should not be given controlling

weight, the ALJ "must determine how much weight, if any, to give" the opinion.  *Schillo*, 31

F.4th at 75 (quotation marks omitted).  In making this determination, SSA regulations require the

ALJ to "consider certain nonexclusive factors": "(1) the frequency, length, nature, and extent of

---

[8] Citations to SSA regulations in this section are to the version of the "treating source
rule" that is applicable to claims filed before March 27, 2017.  Plaintiff filed for DIB and SSI on
December 22, 2016; accordingly, this version of the treating source rule is the applicable
standard for this matter.

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the

opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.*

(quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(c)(6).  The ALJ need

not provide a "slavish recitation of each and every factor where the ALJ's reasoning and

adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)

(summary order); *see also Martinez-Paulino v. Astrue*, No. 11-cv-5485 (RPP), 2012 WL

3564140, at *16 (S.D.N.Y. Aug. 20, 2012) ("It is not necessary that the ALJ recite each factor

explicitly, only that the decision reflects application of the substance of the rule." (citing

*Halloran*, 362 F.3d at 32)).  Nonetheless, the Commissioner must "always give good reasons in

[his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant]'s

treating source's opinion," 20 C.F.R. § 404.1527(c)(2), and must "comprehensively set forth

reasons for the weight" ultimately assigned to the treating source, *Halloran*, 362 F.3d at 33.

"Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician

is a ground for remand."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  Certain findings,

however, such as whether a claimant is disabled and cannot work, are reserved to the

Commissioner.  20 C.F.R. § 404.1527(d)(1).

### 2.  The ALJ's Application of the Treating Physician Rule

#### a.  Dr. Terrelonge

ALJ Feuer appropriately gave "little weight" to the opinion of Dr. Terrelonge, Plaintiff's

treating psychologist in significant part because, as the ALJ correctly explained, "it is nearly

impossible to reconcile Dr. Terrelonge's opinion with the treatment notes."  AR 24.

Dr. Terrelonge, a nurse practitioner with a doctorate in psychology, began treating

Plaintiff on November 28, 2016.  AR 1198.  On that date, Plaintiff was referred for a psychiatric

assessment due to his history of depression and anxiety.  *Id.*  During that initial visit, Plaintiff reported to Dr. Terrelonge that his "his depression started one year ago" and that while he had been prescribed "Remeron and another medication which he was unable to recall[,] . . . he last took medication about 6 months ago because he didn't think he needed medication any longer." *Id.*  Plaintiff also reported that he had been admitted to St. Barnabas Hospital in May 2016 "for depression" which Plaintiff attributed to "his drug[] use," but Plaintiff "denie[d] any current depression or anxiety symptoms."  *Id.*  The notes further reflect that Plaintiff "has been coping well but reports he has not been sleeping well at nights."  *Id.*  Dr. Terrelonge also indicated that Plaintiff presented as "alert and oriented . . . with organized thought processe[s] and fair concentration."  *Id.*  With respect to medication, Dr. Terrelonge noted that a review of Plaintiff's records show he had been prescribed "Seroquel 300mg, Abilify 5mg and [A]mbien 10mg," but Plaintiff reported "he does not need th[e] medication[s] and has not been taking them and does not feel the need for them at this time" and "has been functioning well with out [*sic*] them."  *Id.* After the initial visit, Dr. Terrelonge continued treating Plaintiff throughout the relevant period. *See* AR 64, 669-87, 1218-1276.

Dr. Terrelonge also completed three Medical Source Statements ("MSSs")—two during the requested closed period and one in 2019.  AR 920-23, 1558-61, 1904-07.  In the first statement, completed on April 27, 2017, Dr. Terrelonge stated that Plaintiff had moderate impairments in, among other things, understanding and remembering simple instructions, carrying out simple instructions, and making work-related decisions.  AR 920.  It is unclear what, specifically, Dr. Terrelonge considered in rendering this assessment, as he left the section of the form blank where he was asked to "identify the factors (*e.g.*, the particular medical signs, laboratory findings, or other factors described above) that support your assessment."  *Id.*  Dr.

Terrelonge also stated that Plaintiff was markedly limited in interacting appropriately with the public and supervisors and in responding appropriately to usual work situations and to changes in a routine work setting.  In support of these opinions, Dr. Terrelonge noted Plaintiff "has bipolar [disorder] and suffers from mood swings."  AR 921.

In contrast to the April 27, 2017 MSS, Dr. Terrelonge's treatment notes from multiple visits on or before that date indicate that Plaintiff presented "with organized thought processe[s] and fair concentration."  *See, e.g.*, AR 1198, 1205, 1208, 1210, 1218.  On March 27, 2017, Dr. Terrelonge noted Plaintiff was "doing well with his medication," and while he "continue[d] to use cocaine intermittently," he "denie[d] any other problems"; Dr. Terrelonge further stated that there were "no acute depression symptoms noted or reported."  AR 1210.  Dr. Terrelonge's notes for April 24, 2017 reflect that Plaintiff reported he was "doing well with his current medications . . . and no complaints made at this time," and again Dr. Terrelonge stated that there were "no acute depression symptoms noted or reported."  *Id.*  Dr. Terrelonge again stated that Plaintiff exhibited "organized thoughts" and "fair concentration."  AR 1218.  On April 27, 2017, Dr. Terrelonge wrote, "no acute depression symptoms noted or reported," and that Plaintiff appeared "alert and oriented."  AR 1220.  He also noted Plaintiff's "impulse control [was] adequate."  *Id.*

Dr. Terrelonge completed a second MSS on May 30, 2017.  AR 1904-07.  In this MSS, Dr. Terrelonge stated that Plaintiff exhibited a host of signs and symptoms including mood disturbance, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, manic syndrome, and intrusive recollections of a traumatic experience.  AR 1904.  Dr. Terrelonge also opined that Plaintiff had a marked to extreme loss in nearly all areas of functioning in the workplace including remembering locations and work-like procedures; understanding and remembering very short,

simple instructions; getting along with coworkers without distracting them or exhibiting

behavioral extremes; and maintaining socially appropriate behavior. AR 1906. This report

appears to represent a substantial deterioration in Plaintiff's condition as to these metrics from

the April 27, 2017 MSS, which was prepared just one month earlier.

Yet Dr. Terrelonge's treatment notes from his two appointments with Plaintiff between

issuing the April 27, 2017 MSS and issuing the May 30, 2017 MSS are not consistent with these

findings. At Plaintiff's May 22, 2017 appointment, Dr. Terrelonge noted that Plaintiff had been

"feeling less anxious and [was] able to control his mood better." AR 1221. Dr. Terrelonge also

noted Plaintiff "denie[d] [a]ny mood problems" and requested to reduce the medication he had

been prescribed to treat his depression. *Id.* With respect to Plaintiff's mental status, Dr.

Terrelonge described Plaintiff to have a cooperative attitude, appropriate eye contact, intact

thought process, with intact memory, judgment, insight, and reliability. *Id.* Dr. Terrelonge also

again documented Plaintiff's "organized thoughts" and "fair concentration," and that "no acute

depression symptoms [were] noted or reported." *Id.* On May 30, 2017, Plaintiff had an

appointment with Dr. Terrelonge for a medication refill. AR 1223. The treatment notes from

this appointment state Plaintiff appeared "alert and oriented" with "organized thoughts" and "fair

concentration" and state that Plaintiff did not report any symptoms of depression. *Id.*

In sum, Dr. Terrelonge's MSSs from the closed period are inconsistent with the

information set forth in his treatment notes from the same timeframe. Dr. Terrelonge's May

2017 MSS is particularly difficult to reconcile with his treatment notes. In the May 2017 MSS,

Dr. Terrelonge stated that Plaintiff was experiencing a "marked"—or "substantial loss of

ability"—to perform such functions as "adhere to basic standards of neatness and cleanliness"

and "be aware of normal hazards." AR 1906. The May 22, 2017 treatment notes, however,

include a notation that Plaintiff appeared well-groomed and appropriate, and that his judgment, insight, and thought processes were all intact.  AR 1221.  In the May MSS, Dr. Terrelonge also stated Plaintiff was experiencing an "extreme"—or "complete loss of ability"—to interact appropriately with the public and to get along with coworkers without exhibiting behavioral extremes.  AR 1906.  But according to the May 22, 2017 treatment notes, Plaintiff exhibited a cooperative attitude, did not demonstrate any disturbances of perception, and reported he had been feeling less anxious and was able to control his moods better.  AR 1221.  And on May 30, 2017, Dr. Terrelonge noted that Plaintiff appeared "alert and oriented" with "organized thoughts" and "fair concentration."  AR 1223.

Treatment notes prepared by Dr. Terrelonge for Plaintiff's monthly appointments throughout the remainder of the closed period universally contain similar positive reports regarding Plaintiff's stability and progress.  *See, e.g.*, AR 1228-29 (6/19/17 appointment— "doing good with his medication"; "eating and sleeping well"; all indicators positive in mental status examination); AR 1230-33 (7/17/17 appointment—"organized thoughts" and "fair concentration"; "no acute depression symptoms noted or reported"; all indicators positive in mental status examination); AR 1234-37 (8/14/17 appointment—"organized thoughts" and "fair concentration"; "no acute depression symptoms noted or reported"; all indicators positive in mental status examination); AR 1238-41 (9/11/17 appointment); AR 1245-47 (10/10/17 appointment); AR 1258-62 (11/7/17 appointment); AR 1266-68 (12/5/17 appointment).

* * * * * * * * * *

Courts have recognized that "[b]ecause mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health."  *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342

(E.D.N.Y. 2010) (quotation marks omitted).  Even in the mental health context, however, the treating physician rule is not absolute.  A mental health treating provider's opinion can be discounted when it is inconsistent with contemporaneous treatment records.  *See, e.g.*, *Ramos v. Comm'r of Soc. Sec.*, No. 13-cv-6561 (AJN) (SN), 2015 WL 708546, at *16-17 (S.D.N.Y. Feb. 4, 2015) (ALJ did not err in according "little weight" to the opinion of claimant's treating psychiatrist where the opinion conflicted with "consistent treatment notes"); *Dorta v. Saul*, No. 19-cv-2215 (JGK) (RWL), 2020 WL 6269833, at *5 (S.D.N.Y. Oct. 26, 2020) (ALJ may set aside the opinion of treating physician that is "inconsistent with their own contemporaneous treatment notes and other evidence in the record").

ALJ Feuer provided good reasons for giving little weight to the opinions offered by Dr. Terrelonge, given the degree to which those opinions were inconsistent with Dr. Terrelonge's own treatment notes and other substantial evidence in the record, including the opinions of Drs. Sebold, Blackwell, and Efobi.  AR 23-25, 45-55 (Dr. Efobi testimony), 94-96 (Dr. Blackwell opinion), 625-29 (Dr. Sebold opinion).  The ALJ's decision to give "good weight" to the less restrictive assessments offered by these three physicians was appropriate given that the opinions were generally consistent with each other and were supported by other evidence in the record, including Dr. Sebold's examination findings, AR 627-28, and the notes of Plaintiff's treatment with Dr. Terrelonge.  It is well settled that the opinion of a consultative examiner like Dr. Sebold may serve as substantial evidence in support of an ALJ decision, *see, e.g.*, *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983), and that an ALJ may rely on the opinion of a medical expert such as Dr. Efobi even if that expert has not examined the claimant, *see Botta v. Colvin*, 669 F. App'x 583, 584 (2d Cir. 2016) (summary order).  In sum, the ALJ's decision and the Court's examination of the record amply demonstrate the contradictions between Dr. Terrelonge's MSSs

and the remainder of the record, and therefore the ALJ committed no error in assigning "little weight" to Dr. Terrelonge's opinions.

> **b.   Dr. Liriano**

There was also no error in the ALJ's decision to give "little weight" to the restrictive April 17, 2017 opinion of Plaintiff's treating internist, Dr. Liriano.  *See* AR 22.

Dr. Liriano began treating Plaintiff in September 2016.  AR 660.  During his initial visit, Plaintiff complained of insomnia and right foot pain related to a fracture that he suffered on May 26, 2016.  *Id.*  In treatment records from that date, Dr. Liriano noted that except for the pain and insomnia, "patient has no constitutional symptoms or other complaints."  *Id*.  Dr. Liriano conducted a physical examination and noted that Plaintiff had a "tender right foot" but no swelling or discoloration.  AR 661.  Following the initial visit, Dr. Liriano continued to treat Plaintiff.  While Plaintiff continued to complain of pain in his right foot, he denied experiencing pain in other areas, including his back, neck, or chest.  AR 663 (10/21/16 appointment).  Plaintiff also denied any respiratory issues such as coughing, sobbing, or wheezing.  *Id.*  In a follow-up visit on January 3, 2017, Dr. Liriano noted that Plaintiff's right foot was still tender, but that he denied any pain in his chest, lower back, or abdominals, and denied any respiratory issues.  AR 653.  In April 13, 2017 treatment notes, Plaintiff's heart, chest, and lungs were described as "regular" and "normal," and he was observed to have a full range of motion in his shoulders.  AR 648.  Dr. Liriano also recorded that Plaintiff had a "slightly unsteady/ataxic gait," referred Plaintiff to "pain medicine," and noted Plaintiff "presents for physical therapy to help alleviate the pain [and] improve ambulation."  AR 648-49.

Dr. Liriano completed an MSS on April 17, 2017.  AR 639-44.  In that opinion, Dr. Liriano stated that Plaintiff could occasionally lift and carry up to 20 pounds and could

continuously carry up to 10 pounds; that he could sit for only two hours and walk and stand for only one hour each during an eight-hour workday; and needed a cane if walking more than two city blocks.  AR 639-40.  Dr. Liriano also opined that Plaintiff could only occasionally reach, push, and pull with his non-dominant right hand and that he could never operate foot controls with his right foot.  AR 641.  With respect to "postural activities," Dr. Liriano further stated that Plaintiff could never climb ladders or scaffolds, balance, stoop, or crouch, could only occasionally climb stairs or ramps, kneel, or crawl, and could never tolerate respiratory irritants. AR 642-43.  In terms of particular personal activities, Dr. Liriano stated that Plaintiff was generally unrestricted and could perform activities such as shopping, traveling alone, feeding himself, and dealing with paper/files.  AR 644.  Dr. Liriano stated that Plaintiff could not walk a block at a reasonable pace on rough or uneven surface or climb a few steps at a reasonable pace without the use of a handrail.  *Id.*  Finally, Dr. Liriano opined that the limitations he found had lasted or would last for twelve consecutive months.  *Id.*

The ALJ sufficiently explained various ways Dr. Liriano's medical opinion was inconsistent with clinical records, his activities of daily living, and other opinions in the record. *See* AR 21.  Specifically, Dr. Liriano's opinions that Plaintiff was limited in sitting, in using his upper right extremity, in various postural activities, and in his ability to tolerate respiratory irritants are contradicted by Plaintiff's own statements, other medical evidence in the record, and Dr. Liriano's own treatment notes.  As the ALJ explained, there is no support in the record for Dr. Liriano's opinion that Plaintiff had any trouble sitting, AR 22—in fact, in a form completed by Plaintiff in February 2017 in connection with his application for benefits, Plaintiff indicated that his illnesses, injuries, or conditions did not affect his ability to sit, AR 336.  Similarly, in other reports by Plaintiff of his own symptoms and limitations, he did not mention any issues

with sitting; nor did he claim to have any issues with his right upper extremity, or voice any complaints that would substantiate Dr. Liriano's highly restrictive postural findings, or respiratory restrictions. *See, e.g.*, AR 331-46, 479, 660, 667, 934. In treatment notes, Dr. Liriano repeatedly stated that Plaintiff denied any respiratory issues and denied experiencing pain anywhere other than in his foot. *See, e.g.*, AR 649, 651, 653, 661, 663. The ALJ also correctly noted that Dr. Liriano's assessment of environmental limitations was without support in the record as Plaintiff had not "been diagnosed with asthma or any respiratory condition that would warrant environmental limitations." AR 22; *see also* AR 660 ("no history of . . . ASTHMA"); AR 663 (Plaintiff denied experiencing any respiratory issues). The particular limitations assessed by Dr. Liriano are also incompatible with the substantial evidence of Plaintiff's activities of daily living, "including laundry, cooking and cleaning." AR 22 (citing AR 331-346); *see also* AR 628 (Plaintiff reported he is able to clean, do laundry, shower, dress, attend church). All of this evidence—though inconsistent with Dr. Liriano's opinion—is consistent with the ALJ's ultimate determination that Plaintiff an RFC only for sedentary work, which is defined as jobs that only occasionally require walking or standing. *See* 20 C.F.R. § 404.1567(a).

The ALJ also contrasted Dr. Liriano's opinions with the findings of Dr. Archbald, who performed a consultative physical examination and whose opinion was accorded "some weight" by the ALJ. AR 22. Dr. Archbald noted Plaintiff maintained "[s]trength 5/5 in the upper and lower extremities," his chest and lungs were "normal," he needed "no help changing for exam," and "no help getting on and off exam table." AR 632-33. While ALJ Feuer ultimately determined that Plaintiff had greater physical limitations than those assessed by Dr. Archbald, there was nothing in Dr. Archbald's examination findings—or anywhere else in the record—to

support the particular limitations in sitting and right upper extremity use, the postural limitations, or the environmental restrictions in Dr. Liriano's opinion.

Dr. Liriano's opinion—particularly as to these specific metrics—was contradicted by other substantial evidence in the record.  *See Veino*, 312 F.3d at 588.  It was appropriate for ALJ Feuer to give less than controlling weight to this opinion, and the ALJ provided good reasons for his decision to do so.

* * * * * * * * * *

For all of these reasons, ALJ Feuer appropriately applied the treating physician rule in assigning less than controlling weight to the medical opinions of Dr. Terrelonge and Dr. Liriano.

### C.      Side Effects of Medication

SSA regulations require the Commissioner to consider the "type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or ha[s] taken to alleviate [his] pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).  "But those regulations also caution that statements about 'pain or other symptoms,' including side effects, must be supported by 'objective medical evidence from an acceptable medical source.'"  *Cardona v. Saul*, No. 18-cv-6198 (JPO), 2019 WL 5387885, at *3 (S.D.N.Y. Oct. 22, 2019) (quoting 20 C.F.R. § 404.1529(a)).

Plaintiff maintains that he experienced side effects from certain medications, and that the ALJ should have specifically considered the impact of these side effects on Plaintiff's RFC.  Pl.'s Mem. at 24-25.  In support of Plaintiff's assertion, he cites to four records.  The first is a March 2016 treatment note from a psychotherapy session—before the closed period at issue here—noting that Plaintiff reported "that medications keep him sleepy most of the day."  *Id.* at 24 (citing AR 983).  A record regarding symptoms experienced by Plaintiff before the period of

alleged disability is of little value in the overall analysis of a claimant's condition during the relevant period, especially when that record is not consistent with medical records from within the relevant period. *Carway v. Colvin*, No. 13-cv-2431 (SAS), 2014 WL 1998238, at *5 (S.D.N.Y. May 14, 2014) ("medical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability").

The second and third documents are May 30, 2017 and March 12, 2019 MSSs from Dr. Terrelonge noting side effects from Plaintiff's medications that "may have implications for working," including drowsiness, dizziness, malaise, fatigue, lethargy, and nausea.  Pl.'s Mem. at 24 (citing AR 1559, 1905).  Plaintiff does not, however, cite to anywhere in the record where Plaintiff actually complained of the listed side effects.  Rather, these records appear to note *potential* side effects, not *actual* side effects.  To the extent that Dr. Terrelonge's notations were meant to indicate that Plaintiff was in fact experiencing such side effects, such statements would be in stark contrast to Dr. Terrelonge's treatment notes, which repeatedly reiterate that Plaintiff was *not* experiencing any side effects or problems from his medications during the closed period. *See, e.g.*, AR 676, 678, 680, 682, 1205, 1208, 1210, 1218, 1220, 1221, 1230, 1234, 1258, 1273.

The final record cited by Plaintiff is a February 2019 MSS completed by Dr. Liriano. Pl.'s Mem. at 24 (citing AR 1553).  Again, however, this record is from outside the relevant time period, appears to list potential rather than actual side effects, does not represent Plaintiff's report of any actual side effects, and is inconsistent with the numerous treatment records where Plaintiff reported that he was not experiencing any side effects from his medications.

In sum, there is no evidence from the closed period at issue here that indicates that Plaintiff ever experienced any side effects from any medication during that period.  Accordingly, the ALJ did not err in failing to consider any purported side effects associated with Plaintiff's

medications in formulating Plaintiff's RFC, because such alleged side effects are not "supported by 'objective medical evidence from an acceptable medical source.'" *Cardona*, 2019 WL 5387885, at *3 (quoting 20 C.F.R. § 404.1529(a)).

### D.   Consistency with Paragraph B Criteria Findings

In cases involving a mental RFC, "[a] determination made at [s]tep three [ ] need not carry over verbatim to the ultimate RFC determination because the two determinations require distinct analysis." *Richard B. v. Comm'r of Soc. Sec.*, No. 20-cv-585 (MJR), 2021 WL 4316908, at *6 (W.D.N.Y. Sept. 23, 2021).  "While the analysis at steps two and three concerns the *functional effects* of mental impairments, the RFC analysis at step four specifically considers *work-related* physical and mental activities in a *work setting*."  *Chappell v. Comm'r of Soc. Sec.*, No. 18-cv-01384 (EAW), 2020 WL 1921222, at *6 (W.D.N.Y. Apr. 21, 2020) (emphasis in original).

With respect to concentration, persistence, and pace, Plaintiff contends that "the ALJ's RFC should explicitly incorporate any limitations in this area."  Pl.'s Mem. at 25.  But contrary to Plaintiff's argument, the RFC set forth in the ALJ decision does account for limitations in concentration, persistence, and pace—specifically, Plaintiff is limited to performing simple, routine, and repetitive tasks.  AR 19.  Consistent with SSA requirements, the ALJ's decision "'include[s] a discussion of [Plaintiff's] abilities'" "'to do sustained work activities in an ordinary work setting on a regular and continuing basis.'"  *Melville*, 198 F.3d at 52 (quoting SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)).  The ALJ explained that the RFC is supported by treatment notes that document Plaintiff's mental limitations and the opinions of Drs. Sebold and Efobi.  AR 25.  The ALJ also discussed how Dr. Sebold's opinion further supports the RFC determination, as Dr. Sebold opined that Plaintiff was "not limited for doing simple tasks or

sustaining an ordinary work routine and regular attendance at work." *Id.*. Finally, the ALJ

discussed Plaintiff's own reports that he had "difficulty paying attention, finishing what he

started, could not follow spoken or written instruction, and had difficult remembering and

managing stress." AR 23. The ALJ found, however, that to the extent these conditions existed,

they had been mitigated—once Plaintiff began treatment for his substance use disorder and

bipolar disorder, his mental status and functioning improved. *Id.*

Plaintiff's assertions regarding his ability to adapt and manage himself are likewise

without merit. "Limitations in work complexity and in interpersonal interaction are often

imposed to address a claimant's limitations in adaptive categories of functioning." *Platt v.

Comm'r of Soc. Sec.*, -- F. Supp. 3d --, 2022 WL 621974, at *7 (S.D.N.Y. Mar. 3, 2022)

(collecting cases). Moderate limitations in this area are often addressed through an RFC that

limits a claimant to "a low stress environment with occasional decision-making." *Id.* Here, the

RFC properly accounts for Plaintiff's conditions by specifying a non-exertional limitation

restricting Plaintiff to jobs that would only require "simple work-related decisions" where he

would only "occasional[ly] interact[ ] with co-workers, supervisors and the general public." *See*

AR 19-20. The ALJ adequately explained that Dr. Sebold's opinion supports this aspect of the

RFC determination, as Dr. Sebold opined that Plaintiff was "only mildly limited for interactions"

and not limited for simple tasks. AR 25. And although Plaintiff reported he had difficulty

managing stress, the ALJ noted that Plaintiff's functioning in this respect improved with

treatment. *See* AR 23.

The ALJ's task at step four was to consider "work-related physical and mental activities

in a work setting," not all of the "functional effects of mental impairments." *See Chappell*, 2020

WL 1921222, at *6 (emphasis omitted). Further, while Plaintiff generally maintains that the

non-exertional limitations in this RFC fail to address his specific limitations, he does not provide any evidence or explanation—other than medical opinions that the ALJ appropriately discounted—to support his argument.  In sum, the ALJ's RFC findings with respect to non-exertional limitations attributable to Plaintiff's mental conditions were supported by substantial evidence, and any perceived disconnect between these findings and the ALJ's evaluation of the paragraph B criteria of Listing 12.04 at step three of the analysis was not legal error.

### E.   Operating Foot Controls and Stooping

The ALJ also did not err by failing to include limitations in the RFC determination regarding Plaintiff's ability to operate foot controls or engage in stooping.

With respect to operating foot controls, Plaintiff asserts that the "RFC was also deficient as it made no allowances for limitations in operating foot controls, despite abundant evidence that Mr. Reyes had reduced range of motion, swelling, tenderness, weakness, stiffness, and pain in his ankle."  Pl.'s Mem. at 27.  But because the RFC limited Plaintiff to sedentary work, there was no need to specify a limitation regarding foot controls—SSA guidance does not contemplate the use of foot controls in the context of sedentary work.  *See* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983) (describing the need for "some pushing and pulling of arm-hand or leg-foot controls" only in connection with "light work," and noting that the use of such controls "*require[s] greater exertion than in sedentary work*" (emphasis added)).  It is nothing more than harmless error for the ALJ to have failed to specifically list a limitation regarding foot controls in the RFC here.  *See Zipporah M. v. Comm'r of Soc. Sec.*, No. 20-cv-1333 (DJS), 2022 WL 1115629, at *3 (N.D.N.Y. Apr. 14, 2022); *Harbour v. Astrue*, No. 07-cv-20, 2008 WL 2222269, at *11 (W.D. Va. May 27, 2008) ("it is clear that sedentary work does not require the pushing and pulling of leg-foot controls and, therefore, the ALJ's failure to specifically list such a

limitation in his formal residual functional capacity finding is, again, nothing more than harmless error"), *adopted by* 2008 WL 2381710 (W.D. Va. June 9, 2008).

Regarding Plaintiff's alleged inability to stoop, Plaintiff cites to an opinion by Dr. Deepak Sawlani, who examined Plaintiff in September 2016, and the highly restrictive postural limitations in the MSSs prepared by Dr. Liriano, which indicated that Plaintiff could never balance or stoop.  *See* Pl.'s Mem. at 27 (citing AR 462, 642, 1555).[9]  Dr. Sawlani noted that Plaintiff was unable to engage in "*repetitive* bending, crouching, stooping" during the closed period.  AR 462 (emphasis added).  Stooping is defined by the SSA as "a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).  "A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work."  SSR 96-9P, 1996 WL 374185, at *8 (July 2, 1996) (emphasis in original).  The SSA has been clear that "work performed primarily in a seated position[, *i.e.*, sedentary work,] entails no significant stooping." SSR 83-10, 1983 WL 31251, at *5.  Further, the evidence in the record supports a finding that Plaintiff did not have any significant limitations that would impact his ability to bend his spine at the waist.  For example, Dr. Liriano's treatment records reflect that Plaintiff denied any lower back pain or stiffness repeatedly throughout the relevant period.  AR 651, 663, 1519; *see MacLean v. Comm'r of Soc. Sec.*, No. 16-cv-3270 (GWG), 2017 WL 4082797, at *8 (S.D.N.Y. Sept. 14, 2017) (finding substantial evidence to support ALJ's conclusion that a claimant was not

---

[9] The incompatibility of Dr. Liriano's findings with the evidence in the record is addressed in Section III.B.2.b, *supra*.

limited in his ability to stoop where "[t]here are no notations of [claimant] having limitations in range of movement of his back").  At most, there is some evidence in the record to suggest that Plaintiff could not engage in repetitive stooping, but because sedentary work does not require repetitive stooping, the ALJ's failure to reference any minimal limitations in stooping also amount to nothing more than harmless error.

**F.      Use of a Cane to Walk But Not to Stand**

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence insofar as the ALJ determined Plaintiff required a cane to walk but not to stand. Plaintiff maintains that the ALJ failed to explain how he concluded that Plaintiff did not require a cane to stand, that there is no medical opinion evidence specifically stating that Plaintiff did not require a cane to stand, and that other evidence in the record indicates that Plaintiff's cane was medically necessary.  Pl.'s Mem. at 27.  Again, Plaintiff's arguments are not supported by the record.

The medical evidence supports the conclusion that Plaintiff only required a cane for walking.  In a September 2016 examination by FEDCAP, Plaintiff reported that he was using a crutch to walk and that he experienced pain in his right foot when walking long distances and climbing stairs.  AR 479-80; AR 21.  Plaintiff did not report that he required a crutch to support himself when standing.  Treatment notes from February 7, 2017 show that on that date, Plaintiff requested a cane "to aid in ambulation."  AR 940.  Dr. Archbald opined that Plaintiff's cane "appears to be medically necessary" and without it, "he walks with a mild limp and slow gait." AR 632.  But Dr. Archbald only discussed how the cane helped Plaintiff to walk, and did not conclude that Plaintiff required a cane to stand.  Dr. Liriano's treatment notes state that Plaintiff "[a]mbulates with [a] standard cane," AR 926, 931, but do not indicate that Plaintiff required the

cane for anything other than walking.  In fact, while Dr. Liriano's opinion notes that Plaintiff required a cane to walk, he also reports that without the cane, Plaintiff could walk two city blocks.  AR 640.  This is not suggestive of a need to have a cane for purposes of standing.  Accordingly, the ALJ's determination that Plaintiff required a cane to walk, but not to stand, is supported by substantial evidence.

While Plaintiff would have the Court conclude that the ALJ should have found that Plaintiff required a cane to stand, there is no medical opinion or other item of evidence in the record that would have supported such a finding.  "A lack of supporting evidence on a matter for which the claimant bears the burden of proof . . . can constitute substantial evidence supporting a denial of benefits." *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (summary order); *see Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) (rejecting plaintiff's argument that RFC was deficient where plaintiff "had a duty to prove a more restrictive RFC, and failed to do so").

Because the RFC determination that Plaintiff required a cane to walk, but not to stand, is supported by substantial evidence and Plaintiff has not identified any record evidence to the contrary, the Court declines to find that the RFC was deficient on this basis.

### G.      Plaintiff's Ability to Speak English

Plaintiff maintains that the RFC was deficient because the ALJ concluded that Plaintiff could communicate in English.  This argument, however, is not properly raised in connection with the RFC determination.  At the time Plaintiff's claim for benefits was adjudicated, the ability to understand English was a vocational factor of education to be considered at step five, not in connection with the RFC.  *See, e.g.*, *Yulfo-Reyes v. Berryhill*, No. 17-cv-2015 (SALM),

2018 WL 5840030, at *10 (D. Conn. Nov. 8, 2018).[10]  Under the version of the SSA regulations

applicable here, the ALJ was "*not* required to consider plaintiff's ability to communicate in

English when assessing plaintiff's RFC." *Feliciano Velez v. Berryhill*, No. 18-cv-1101 (SALM),

2019 WL 1468141, at *5 (D. Conn. Apr. 3, 2019) (emphasis in original); *see, e.g.*, *Alva v.

Colvin*, No. EP-3-14-cv-00026-RFC, 2015 WL 1529755, at *4 (W.D. Tex. Apr. 2, 2015); *Sud v.

Barnhart*, No. 05-2582, 2006 WL 925001, at *2 (E.D. Pa. Apr. 6, 2006).  ALJ Feuer applied the

correct procedure by addressing Plaintiff's ability to communicate in English after concluding

his RFC analysis and also after evaluating the step four factors.  *See* AR 26.

Plaintiff's English abilities were not relevant to the RFC determination, and the ALJ committed

no error in this regard.  Any discussion about Plaintiff's ability to speak English and the relative

impact on his ability to perform work is more properly addressed in connection with the step five

analysis.

* * * * * * * * * *

"An RFC assessment must be upheld on appeal where, as here, it is supported by

substantial evidence in the record." *Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 226 (E.D.N.Y.

2021) (citing *Barry*, 606 F. App'x at 622 n.1).  In addition, "[a]n ALJ need not recite every piece

of evidence that contributed to the decision, so long as the record permits us to glean the

---

[10] For cases filed after April 27, 2020, the SSA no longer considers "inability to communicate in English" as an education category to be assessed at step five.  *See* Removing Inability to Communicate in English as an Education Category, 85 Fed. Reg. 10,586-01 (Feb. 25, 2020) (explaining "[t]his education category is no longer a useful indicator of an individual's educational attainment or of the vocational impact of an individual's education because of changes in the national workforce since we adopted the current rule more than 40 years ago"). But because the ALJ rendered his decision on December 20, 2019, "inability to communicate in English" was the appropriate standard to consider as part of the step five analysis here.  *See Negron v. Saul*, No. 19-cv-7547 (KMK) (JCM), 2021 WL 465768, at *26 n.22 (S.D.N.Y. Feb. 8, 2021), *adopted by* 2021 WL 1254426 (S.D.N.Y. Apr. 5, 2021).

rationale of an ALJ's decision." *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (*per curiam*) (quotation marks omitted).  As noted above, the ALJ included an extensive discussion of the medical and non-medical evidence in the record, including treatment records, consultative medical examination reports, medical opinion evidence, and Plaintiff's own testimony, as well as an explanation of how he evaluated such evidence, in arriving at his determination of Plaintiff's RFC.  *See* AR 20-25.  Furthermore, as already explained, the ALJ properly weighed the medical opinion evidence in the record from both treating and non-treating sources.  Accordingly, the ALJ properly determined Plaintiff's RFC, and the ALJ's RFC determination is supported by substantial evidence.

## IV.    The Step Five Determination

The ALJ erred at step five of the sequential analysis because he neither obtained testimony from a vocational expert nor provided any explanation as to whether Plaintiff's non-exertional limitations would affect the range of sedentary work that Plaintiff could perform.[11]  At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (*per curiam*).  Although "[i]n the ordinary case, the Commissioner meets [her] burden at the fifth step by resorting to the applicable medical vocational guidelines (the [G]rids)," *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (quoting *Rosa*, 168 F.3d at 78), "[t]he Grids are inapplicable in cases where the claimant exhibits a significant non-exertional impairment (*i.e.*, an

---

[11] Plaintiff also maintains that the ALJ erred at step five by applying Rule 201.21 of the Medical Vocational Rules because his past relevant work was neither skilled nor semi-skilled, and because there was no substantial evidence that Plaintiff was literate in English.  He also disputes the ALJ's conclusion that the use of a cane when walking does not erode the occupational base.  Pl.'s Mem. at 28-31.  Because the Court finds that remand is warranted the step five analysis for other reasons, the Court does not reach Plaintiff's additional arguments related to step five.

impairment not related to strength)," *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013).  "[T]he ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."  *Id.* (citing *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)); *see also Saiz v. Barnhart*, 392 F.3d 397, 400 (10th Cir. 2004) (*per curiam*).  A non-exertional impairment is non-negligible "'when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'"  *Selian*, 708 F.3d at 421 (quoting *Zabala*, 595 F.3d at 411).  But it is not necessary for the ALJ to call a vocational expert to address a plaintiff's non-exertional limitations where the ALJ "carefully analyzed plaintiff's non[-]exertional impairments and determined that there was no *significant* limitation in the range of unskilled sedentary work that plaintiff could perform."  *Zedanovich v. Astrue*, 361 F. App'x 245, 246 (2d Cir. 2010) (summary order) (emphasis omitted).

Here, the ALJ specified three non-exertional limitations for Plaintiff as part of his RFC determination: "he was limited to performing simple, routine and repetitive tasks"; to "making simple work-related decisions"; and to only "occasional interaction with co-workers, supervisors and the general public."  AR 19-20.  In light of these RFC findings, the ALJ was required to either "carefully analyze[ ] plaintiff's non[-]exertional impairments" to determine "that there was no significant limitation in the range of unskilled sedentary work that plaintiff could perform," *Zedanovich*, 361 F. App'x at 246, or call a vocational expert to "produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform," *Rosa*, 168 F.3d at 77-78.  The ALJ did neither.

Instead, ALJ Feuer relied on an inapplicable Social Security Ruling, without any explanation of the basis for his decision, to determine that "the claimant retained the ability to

40

satisfy the mental demands of work." AR 27 (citing SSR 85-15, 1985 WL 56857 (Jan. 1, 1985)).

It is well-established, however, that SSR 85-15—"descriptively titled 'The Medical–Vocational

Rules as a Framework for Evaluating *Solely* Nonexertional Impairments,' does not apply to a

case, such as this one, in which the claimant suffers from a combination of exertional and non-

exertional impairments." *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (emphasis in

original) (summary order); *see also Acevedo v. Saul*, 577 F. Supp. 3d 237, 252 (S.D.N.Y. 2021)

("Courts within the Second Circuit have consistently held that SSR 85-15 does not apply to

claimants who suffer from both exertional and non-exertional impairments."); *Yarington v.*

*Colvin*, No. 13-cv-16S, 2014 WL 1219315, at *5 (W.D.N.Y. Mar. 24, 2015) ("SSR 85-15 does

not even apply to a case like this, where the claimant suffers from a combination of exertional

and non-exertional limitations"). As set forth in the ALJ's decision, Plaintiff had both exertional

and non-exertional limitations as part of his RFC. ALJ Feuer determined that Plaintiff's

medically determinable impairments limited him to sedentary work, *see* AR 19-20, 25-26—this

limitation by itself constitutes a significant exertional limitation for purposes of considering the

jobs in the national economy that Plaintiff could perform. Indeed, as part of his analysis, the

ALJ concluded that Plaintiff could not perform any past relevant work because of his exertional

limitations—those positions "involved standing and walking all day," which the ALJ recognized

Plaintiff would not have been able to do during the closed period at issue. *See My-Lein L. v.*

*Comm'r of Soc. Sec.*, 551 F. Supp. 3d 100, 105 n.2 (W.D.N.Y. 2021) (describing an RFC for

sedentary work as "impos[ing] significant exertional limitations including limited standing and

walking").  Accordingly, the ALJ's cursory and conclusory reliance on SSR 85-15 was

inappropriate and constituted legal error here.[12]

The Commissioner's limited arguments in support of the ALJ's step five determination,

*see* Def.'s Mem. at 29-30, are unavailing.  Like the ALJ, the Commissioner also improperly

relies on SSR 85-15, which is not applicable here in light of Plaintiff's documented exertional

limitations.  And none of the cases cited by the Commissioner on this point stand for the

proposition that an ALJ's decision at step five should be affirmed even though the ALJ has not

sought testimony from a vocational expert to assess the impact of a claimant's non-exertional

limitations, and also has not provided any explanation of whether such non-exertional limitations

would limit the range of work available to the claimant.  *See Bapp v. Bowen*, 802 F.2d 601, 606

(2d Cir. 1986) (remanding to the district court to determine "whether the Secretary has shown

that plaintiff's capability to perform the full range of light work was not significantly diminished

by his [non-exertional limitations].").

"In relying upon the Grids, rather than the testimony of a vocational expert, [the ALJ]

was obligated to explain [his] finding that [Plaintiff's] nonexertional limitations had only a

negligible impact on the range of work permitted by [his] exertional limitations."  *Scott v.

Colvin*, No. 15-cv-8785 (AJP), 2016 WL 3919662, at *10 (S.D.N.Y. July 18, 2016); *see*

---

[12] The language of SSR 85-15 makes clear that it is only to be applied in situations involving claimants who can perform work at all exertional levels, not claimants who are limited to only sedentary level work.  For example, the Ruling states that "[g]iven no medically determinable impairment which limits exertion, the first issue is how much the person's occupational base—*the entire exertional span from sedentary work through heavy (or very heavy) work*—is reduced by the effects of the nonexertional impairment(s)."  SSR 85-15, 1985 WL 56857, at *3 (emphasis added).  Later, the Ruling explains that "[w]here there is no exertional impairment, *unskilled jobs at all levels of exertion* constitute the potential occupational base for persons who can meet the mental demands of unskilled work."  *Id.* at *4 (emphasis added).

*Hernandez v. Colvin*, No. 13-cv-3035 (RPP), 2014 WL 3883415, at *15 (S.D.N.Y. Aug. 7, 2014) ("Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding.").  Instead, ALJ Feuer only stated, in wholly conclusory fashion and without any further explanation, that Plaintiff "retained the ability to satisfy the mental demands of work," before improperly citing to SSR 85-15.  AR 27.  This is not sufficient for the Commissioner to demonstrate that other work exists in significant numbers in the national economy that Plaintiff could perform given his age, education, experience, and RFC.  Accordingly, remand is necessary here so that the ALJ can obtain testimony from a vocational expert and/or provide a more detailed explanation for why Plaintiff's non-exertional impairments do not affect his ability to perform sedentary work.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (ECF No. 23) is GRANTED, the Commissioner's motion for judgment on the pleadings (ECF No. 25) is DENIED, and this matter is remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).[13]

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

Dated: September 27, 2022
White Plains, New York

**SO ORDERED.**

ANDREW E. KRAUSE
United States Magistrate Judge

---

[13] Plaintiff requests that in the event of a remand for further administrative proceedings, he be granted a hearing "before another ALJ." Pl.'s Mem. at 31. Plaintiff has not identified any basis for this request, nor has he provided any legal argument in support of the request. Accordingly, the Court declines to consider the question of whether Plaintiff is entitled to a hearing before a different ALJ upon remand.